**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **JOAN ROSS WILDASIN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| | ) | **Civil No. 3:14-cv-2036** |
| **v.** | ) | **Judge Sharp** |
| | ) | |
| **PEGGY MATHES;** | ) | |
| **HILAND, MATHES &** | ) | |
| **URQUHART; AND BILL** | ) | |
| **COLSON AUCTION &** | ) | |
| **REALTY COMPANY** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM

This is a dispute over the auction sale of a house in Pegram, Tennessee. Plaintiff Joan Ross Wildasin sued the administrator C.T.A. (Peggy D. Mathes, or "Mathes") and the auction company that she hired (Bill Colson Auction & Realty, or "Colson"). Against Mathes, Plaintiff brings claims for negligence as administrator C.T.A. (Count I) and negligence as legal counsel (Count II). Against Colson, she brings claims of negligence and negligence per se (Count III). Both defendants have filed separate Motions for Summary Judgment (Docket Nos. 43, 51.)

For the following reasons, the Court will deny Mathes's Motion on Count I, but grant her Motion on Count II. The Court will deny Colson's Motion on Count III.

## BACKGROUND

Except where otherwise indicated, the following facts are undisputed.

### I.  The Property

Jane Kathryn Ross was the mother of Paul Sorace and Plaintiff.  In 1998, Ross executed a will that left most of her estate to Sorace and Plaintiff in equal portions.  In 2000, she assigned her power of attorney to Plaintiff.  In re Ross, 2014 WL 2999576, at *1 (Tenn. Ct. App. June 30, 2014), perm. app. denied (Tenn. Nov. 21, 2014).

In 1991, Sorace bought a small two-bedroom home on seven acres of land in Pegram, Tennessee, for $57,400.  At some point in 2004, Sorace and Ross began discussing the idea of building a larger home on Sorace's land in Pegram so that they could live together.  They signed an informal agreement to build the home on July 6, 2005, and construction began shortly after that.  Id.  The home was finished about a year later.  By the time that they moved in, Ross had contributed the vast majority of the construction costs—about $433,000 to Sorace's $16,000.  Id.

Ross soon began showing signs of advanced dementia.  By July 2008, her health had deteriorated so dramatically that Plaintiff began to consider moving her into a secure assisted-living center.  Since Ross had few liquid assets, Plaintiff asked Sorace to sell the home in Pegram.  Sorace refused.  Id.  Acting on Ross's behalf, Plaintiff sued Sorace for unjust enrichment.  Id.

Ross died in 2010.  Mathes was appointed Administrator C.T.A of her estate.  Ross's suit against Sorace continued, with the estate substituted as the plaintiff. The case was eventually transferred to the Seventh Circuit Court for Davidson County (the "probate court").

On March 14, 2011, Norris & Norris PLC—which represented Mathes at the time— obtained a professional appraisal of the home in Pegram.  (See Docket No. 73-1, p. 26.)  The

appraisal indicated that the home had 3,553 square feet of finished, above-grade interior space. (Docket No., 30-1, pp. 5–8.)  The appraisal also placed the home's estimated value at $480,000. (Docket No. 73-1, p. 5.)  Norris & Norris emailed a copy of the appraisal to Mathes on December 14, 2011.  (Docket No. 73-1, p. 4.)

The probate court ultimately found for Ross's estate and entered a $417,000 judgment against Sorace.[1]  In re Ross, 2014 WL 2999576, at *2.  When Sorace failed to pay the judgment, the Estate bought the land at a sheriff's auction for $325,000.  (Docket No. 73, ex. 2.)

## II. Auctioning the Property

After the Estate bought title to the land, Plaintiff moved to sell the land at an auction. (Docket No. 52-1.)  The probate court granted the motion and directed Mathes to enter a listing agreement before the sale.   (Docket No. 43-2, p. 1.)

Mathes hired Colson to sell the property at an auction.  Their agreement set out the terms of the sale: the land would be sold within 90 days and the purchase price would be made in cash, with 15% earnest money due on the day of the sale and the remainder paid on closing.  (Docket No. 74-5.)  Robert L. "Bobby" Colson was the auctioneer primarily responsible for handling the sale.[2]  (Docket No. 70, p. 4.)

The sale was nothing new for Bobby Colson.  He has been a licensed auctioneer and real estate broker for about 35 years and has been certified by the Certified Auctioneers Institute since 1987.   He also belongs to the Tennessee Auctioneer Commission, which helps set

---

[1] Plaintiff also sued Sorace for a resulting trust, which the probate court granted.  In re Ross, 2014 WL 2999576, at *1.  The Court of Appeals of Tennessee reversed the probate court's decision and found that "the Estate could be awarded either an award for unjust enrichment, or create a resulting trust, but the Estate could not be awarded both." Id. at *3.  On remand, the Estate moved to set aside the clerk's deed memorializing the resulting trust.  Id. at *2. The probate court granted the Estate's motion.  This left in place only the award for unjust enrichment, which the Court of Appeals upheld.  Id. at *1.

[2] To avoid confusion, the Court will refer to Bobby Colson by his full name.  Defendant Bill Colson Auction & Realty will be referred to simply as "Colson."

standards for auctioneers' conduct throughout the state.  (Docket No. 53, pp. 1–2.)  As he put it in his deposition, he was more than familiar with the "accepted standard of care . . . for auctioneers in Tennessee."  (Docket No. 53, p. 2.)

Once Bobby Colson knew the address of the property, he began researching the land itself.  He turned to an online subscription service called RealTracs.net, which retrieves basic data about land parcels, usually culled and aggregated from public records.  (Docket No. 70, p. 5.)  He testified that he uses this service for "[e]very sale" to learn the dimensions of property that he sells at auction.  (Docket No. 77, p. 57.)  On September 8, 2014, Bobby Colson retrieved a property report for the home, stating that the home's total size was "2538 Sq[uare] Feet."  (Docket No. 74, ex. 9, p. 1.)

The home was actually much larger than that.  On a property-tax card, the Davidson County Tax Assessor's Office lists the home as having 3,573 square feet of centrally-cooled, centrally-heated space, with 2,538 square feet of "Finished Area."  (Docket No. 75-5.)  And the County's Clerk's Deed (Docket No. 20)—which Plaintiff's attorneys had sent to Mathes in 2012—states that the home "consist[s] of approximately 3,553 square feet of living area above grade, and approximately 2,599 square feet of living area below grade."  (Docket No. 74-20, p. 2.)

In his deposition, Bobby Colson testified that he did not directly consult any public records to determine the size of the home.  (Docket No. 77, pp. 50–51, 54–55, 56.)  He also admitted that he did not understand how the square footage listed on the RealTracs report was calculated, or, at the very least, he "hadn't thought about it."  (Docket No. 77, p. 56.)  Still, he relied on the RealTracs report in preparing for the auction sale.  And he relied on this figure to

advertise for the auction, posting several ads for a "2500 Sq. Ft. Brick Home" in local newspapers and online. (Docket No. 53-4; Docket No. 70, p. 8.)

For her part, Mathes admits that she never saw the advertisements before they were printed; when asked what she typically does to ensure that advertisements contain accurate information about real estate, she concedes that she "do[es]n't do anything." (Docket No. 74, p. 50.) Mathes also never sent Colson a copy of the 2011 appraisal, nor did Colson ever request it. (Docket No. 77, p. 36.)

### III. The Auction Sale

The auction sale was scheduled for 10:30 AM on October 18, 2014. (Docket No. 70, p. 7.) About an hour before the auction began, Bobby Colson opened the home to the public. (Docket No. 70, p. 9.) As potential buyers milled around inside the home, Eugene Bulso, Jr.—Plaintiff's attorney in this action—approached Bobby Colson and introduced himself. (Docket No. 70, p. 9.) Bulso then opened a laptop computer that displayed a copy of the March 2011 appraisal report, pointing out that the report listed the home's size as 3,553 square feet—not, as auction flyers had advertised, 2,500 square feet. (Docket No. 70, p. 9–10.)

The auction had not yet begun. Bobby Colson, apparently thinking there was still time to correct the error, found Mathes and told her that "[a] dude just showed [him] an appraisal that the square footage was 3,500." (Docket No. 77, p. 36.) He then made an announcement to the assembled bidders:[3]

> I had—yeah. I had advertised 2500 square feet, which I took off the tax record, but the tax record did not include the upstairs. So there's about another 11 or 12 hundred square feet that—that are up—that—that's upstairs there that we took off an appraisal that one of the attorneys had here if anybody'd like to look at it. But there's another about 1200—so you're looking at probably 3500 square feet there, more or less.

---

[3] A recording of that announcement was played and transcribed at Bobby Colson's deposition.

(Docket No. 77, p. 46.)

Nobody cancelled the auction after the announcement. (Docket No. 70. p. 12.) Bobby Colson later said that this was not unusual: on "more than one occasion," he had learned new information about a piece of property on the day that it was being auctioned, sometimes from neighbors or from other auction attendees. (Docket No. 53, p. 5.) He also felt good about the chances of selling Plaintiff's home. He noticed that there was "a good-sized crowd" gathered at the home that morning, including two people who had bought land at other auctions that Bobby Colson had worked. (Docket No. 53, p. 6.)

The auction began about five minutes after the announcement. (Docket No. 70, p. 14.) After taking bids for about fifteen minutes, Bobby Colson mentioned that the home had been appraised for $480,000 a few years earlier. (Docket No. 70, p. 14.) He also told the crowd that property taxes had assessed the home's value at over $400,000. (Docket No. 70, p. 14.) The bidding continued for a few more minutes. Then, after about half an hour of bidding, Bobby Colson dropped the gavel for the highest bidder. The final sale price was $315,000. (Docket No. 70, pp. 14–15.)

## IV. Approving the Sale Price

Mathes filed a Motion to Approve the auction contract the next week. (Docket No. 52-5, p. 1–3.) On November 7, 2014, the parties appeared at a hearing before Judge David R. Kennedy. Both sides told Judge Kennedy that there was no dispute on the basic question of approving the contract. Mathes stated that Bulso had agreed not to "object to the contract being approved." (Docket No. 73-7, p. 3.) And Bulso also told Judge Kennedy that approving the contract was "the better course," since neither side wanted the "property itself to be embroiled in litigation." (Docket No. 73-7, p. 4.) The bankruptcy trustee said the same thing: the sale was

conducted legally, so there was no reason to prevent the high bidder from buying the home. (Docket No. 73-7, p. 6.)

But the trustee also pointed out that Plaintiff, on behalf of Ross's Estate, had bought the home only a few months earlier for $325,000, which was "very close" to the $315,000 sale price. (Docket No. 73-7, p. 6.)  The trustee then asked Judge Kennedy to acknowledge that $315,000 was the fair market value of the home.  (Docket No. 73-7, p. 7–8.)  He pointed out that Bulso had filed a motion in that earlier sale; in that motion, Bulso had argued that $325,000 "is conclusively presumed to be the value of the property."  (Docket No. 73-7, p. 7.)

Judge Kennedy refused to confirm that $315,000 was the home's fair market value. (Docket No. 73-7, p. 15.)  Still, he approved the sale, noting that the contract set a "fair and reasonable price based upon all of the circumstances" and that $315,000 was a "commercially reasonable price."  (Docket No. 73-7, p. 20.)

This action followed.

## LEGAL STANDARD

Summary judgment "is appropriate only where 'the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.' " Whitfield v. Tenn., 639 F.3d 253, 258 (6th Cir. 2011) (quoting Fed. R. Civ. P. 56(c)).  A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986).  A court's function at the summary-judgment stage is simply to "determine whether there is a genuine issue for trial."  Id. at 249.  In doing so, a court must draw "all reasonable inferences in favor of the nonmoving party." Shreve

v. Franklin Cty., Ohio, 743 F.3d 126, 132 (6th Cir. 2014)  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## ANALYSIS

### I.  Collateral Estoppel

Both Defendants argue that Plaintiff is collaterally estopped from arguing that the home's value is greater than $315,000.  (See Docket No. 44, 4–7, Docket 59, p. 8.)  They point to the probate court's November 24, 2014 Order approving the home's sale, in which Judge Kennedy wrote that the price was a "fair and reasonable price based upon all of the circumstances" and "commercially reasonable."  (Docket No. 44, p. 5; Docket No. 52-6, p. 1.)  Defendants argue that, because the Order constituted a decision as to "value of the property when it was sold at auction," Plaintiff is barred from proving that the home is worth more than its auction price. (Docket No. 44, p. 6–7.)  Defendants note that this question could be dispositive of Plaintiff's entire case: "[S]ince Plaintiff is collaterally estopped from claiming a different value from the auction price," Mathes writes, "Plaintiff cannot prove damages as a matter of law."  (Docket No. 44, p. 7.)

Collateral estoppel prevents relitigation of factual matters that were fully considered and decided in an earlier proceeding.  See, e.g., Edwards v. Aetna Life Ins. Co., 690 F.2d 595, 598 (6th Cir. 1982).  Under Tennessee law,[4] collateral estoppel "bars the same parties or their privies from relitigating in a later proceeding legal or factual issues that were actually raised and necessarily determined in an earlier proceeding."  Mullins v. State, 294 S.W.3d 529, 534 (Tenn. 2009).  The party that argues for collateral estoppel must show that (1) the issue to be precluded

---

[4] When deciding whether to give preclusive effect to a state-court ruling, the Full Faith and Credit Act, 28 U.S.C. § 1738, requires a federal court to give the prior adjudication the same preclusive effect it would have under the law of the state whose court issued the judgment.  See Migra v. Warren City Sch. Dist. Bd. of Educ., 465 U.S. 75, 81 (1984); Stemler v. Florence, 350 F.3d 578, 586 (6th Cir. 2003).

is identical to an issue decided in an earlier proceeding, (2) the issue to be precluded was actually raised, litigated, and decided on the merits in the earlier proceeding, (3) the judgment in the earlier proceeding has become final, (4) the party against whom collateral estoppel is asserted was a party or is in privity with a party to the earlier proceeding to contest the issue now sought to be precluded. Gibson v. Trant, 58 S.W.3d 103, 118 (Tenn. 2001).

Plaintiff argues that Defendants have not satisfied the first collateral-estoppel factor, which requires that the issue already litigated is identical to the issue now before the court. Specifically, Plaintiff argues that Judge Kennedy never ruled on the home's fair market value, so that issue has not been precluded by the probate court's November 24 Order.

The Court agrees. Plaintiff's negligence argument is straightforward: If Colson had properly advertised the home, it would have sold for its fair market value, which was more than its $315,000 contract price. Plaintiff's injuries would therefore equal the difference between the home's fair market value and $315,000. See Turner v. Benson, 672 S.W.2d 752, 754–55 (Tenn. 1984) ("[T]he proper measure of damages . . . in a real estate transaction is . . . the difference between the contract price and the fair market value of the property at the time of the breach."). See also Simmons v. City of Murfreesboro, 2009 WL 4723369, at *5 (Tenn. Ct. App. Dec. 9, 2009) (finding that, in real-estate suit, "the measure of damages is the same under either a negligence or breach of contract theory."). Thus, Plaintiffs are collaterally estopped from proving damages if the probate court made a factual determination as to the home's fair market value at the time of the sale. See Mullins, 294 S.W.3d at 535 (collateral estoppel applies only when identical issues are raised in prior proceeding and case at bar).

But the probate court never ruled on the home's fair market value. Its November 24, 2014 Order said only that $315,000 was "a commercially reasonable price" and a "fair and

reasonable price based on all the circumstances." (Docket No. 52-6, p. 1.) Judge Kennedy carefully chose his words to assure the parties that the Order would not constitute a ruling on the home's fair market value. He said as much during the November 6, 2014 hearing:

> I don't know that I've ever made a ruling that something was sold for its fair market value. That's not the way this Court has historically made these kind of rulings. . . . The question usually is: Is this contract—is this price a fair and reasonable price under all the circumstances? Sometimes . . . this trial court . . . has said, "It appears to the Court that this is for a commercially reasonable price."

> (Docket No. 73-7, pp. 14–15.)

He continued, assuring Bulso that he would not "use[] the words 'fair market value,' " and telling the parties that he was "not going to say that." (Docket No. 73-7, pp. 14–15.) And throughout the hearing, he reminded the parties' that the probate court's role was limited to approving the particular contract of sale before it—not, as Defendants argue, to determine the fair market value of the home. (See Docket No. 73-7.)

Put simply, the probate court's decision had nothing to do with the fair market value of the home. And Defendants have offered nothing to suggest that a ruling on a "commercially reasonable" contract price for a home is actually the same as a determination of the home's fair market value. At best, the two issues share only broad similarities, and mere similarity between two factual issues is not enough to trigger collateral estoppel. Bige v. City of Etowah, 2014 WL 6888857, at *8 (Tenn. Ct. App. Dec. 4, 2014) (finding that collateral estoppel does not bar litigation of an issue when "the issues before the [court] and the [prior court] are *similar* but not *identical*" (emphasis added)).

Defendants have not shown that the probate court made a ruling on the issue that will be litigated in this case—the home's fair market value on October 18, 2014. That showing is required for their collateral estoppel defense. Mullins, 294 S.W.3d at 535 (finding that a party

asserting collateral estoppel has burden of establishing estoppel elements). Plaintiff is not collaterally estopped from offering proof on the fair market value of the home at the time of the auction.

## II. Plaintiff's Negligence & Negligence Per Se Claims

Mathes and Colson argue that they are entitled to summary judgment on Plaintiff's negligence claims.[5]

To prevail in a negligence action, a plaintiff must show five elements: (1) a duty of care owed by defendant to plaintiff; (2) conduct below the applicable standard of care that amounts to a breach of that duty; (3) an injury or loss; (4) cause in fact; and (5) proximate, or legal cause. Giggers v. Memphis Hous. Auth., 277 S.W.3d 359, 364 (Tenn. 2009).

To recover on a theory of negligence per se, an injured plaintiff must show that (1) the defendant violated a law that imposes a duty or prohibits some conduct for the benefit of the public; (2) the plaintiff was within the class of persons intended to benefit from the law; and (3) the defendant's negligence was the proximate cause of the plaintiff's injury. See Cook ex rel. Uithoven v. Spinnaker's of Rivergate, Inc., 878 S.W.2d 934, 937 (Tenn. 1994); Smith v. Owen, 841 S.W.2d 828, 831 (Tenn. Ct. App. 1992).

---

[5] As the forum state, Tennessee choice-of-law principles determine which state's law should be applied. See Maxwell v. Stanley Works, 2006 WL 1967012, at *6 (M.D. Tenn. 2006). This means that the Court should apply "the law of the state with the most significant relationship to the occurrence and the parties." Id. Because Plaintiff's alleged injuries occurred in Tennessee, and both Defendants are citizens of Tennessee, see generally Docket No. 30, Tennessee law should apply. Id.

**A.  Count I: Negligence as Administrator C.T.A. (Mathes)**

Mathes makes two arguments for the Court to grant summary judgment on Plaintiff's negligence-as-administrator-C.T.A. claim.  First, she argues that she is not vicariously liable for Colson's conduct because it was hired as an independent contractor.  And second, she argues that she breached no duty of care to Plaintiff.  The Court rejects both arguments.

**1.  Vicarious Liability**

Mathes argues that, as a matter of law, she cannot be held liable for Colson's negligence. (Docket No. 44, p. 10.)  She notes that she merely "provided Colson with the address" and "did not tell Colson how to run the auction," while Colson "was a distinct business" and "did the work without . . . [Mathes's] supervision."  (Docket No. 44, p. 11–12.)  All of this, Mathes argues, shows that Colson was hired as "an independent contractor," rather than "an agent of Ms. Mathes." (Docket No. 44, p. 10.)

The Court disagrees.  Mathes correctly points out that a "principal is generally not liable for the tortious acts of an independent contractor."  Boren ex. rel Boren v. Weeks, 251 S.W.3d 426, 432 (Tenn. 2008).  But under Tennessee law, an auctioneer hired to sell land at a public auction is not considered an independent contractor; instead, the auctioneer acts as the seller's agent.  Green v. Crye, 11 S.W.2d 869, 870 (Tenn. 1928) ("A person employed as the auctioneer at the sale of property, real or personal, is primarily the agent of the owner."); Lindsey v. Coulter, 1998 WL 823125, at *3 (Tenn. Ct. App. Nov. 24, 1998); Johnson v. Haynes, 532 S.W.2d 561, 564–65 (Tenn. Ct. App. 1975) ("An auctioneer employed to sell land at a public auction is primarily the agent of the seller.").

Since Colson was Mathes's agent, Mathes may still be held vicariously liable for Colson's tortious conduct.   Tennessee's courts have long held that "a principal may be

vicariously liable for the negligent acts of its agent when the acts are within the actual or apparent scope of the agent's authority." Abshure v. Methodist Healthcare-Memphis Hosps., 325 S.W.3d 98, 105 (Tenn. 2010). See also, e.g., Cox v. M.A. Primary & Urgent Care Clinic, 313 S.W.3d 240, 251 (Tenn. 2010); V.L. Nicholson Co. v. Transcon Inv. & Fin. Ltd. 595 S.W.2d 474, 483 (Tenn. 1980); Ohio Life Ins. & Tr. Co. v. Merchs. Tr. Co., 30 Tenn. (11 Hum.) 1, 20 (Tenn. 1850).

A jury could determine that Colson acted within the scope of its authority when it prepared for and conducted the auction. See Bd. of Dirs. of City of Harriman Sch. Dist. v. Sw. Petroleum Corp., 757 S.W.2d 669, 673 (Tenn. Ct. App. 1988) ("[The] scope of an agent's authority under [an] agency [is a] fact determination."). The agreement between the Mathes and Colson set out the auctioneer's responsibilities for selling the land, and Mathes freely admitted that she knew that Bobby Colson would be personally overseeing the sale. (Docket No. 70, p. 4; Docket No. 74-5.) Moreover, Mathes conceded that she was completely comfortable with Bobby Colson handling the background research on the property. In her deposition, she stated that she provided Colson with only the home's address and "[t]he name of the estate" before the sale. (Docket No. 74, p. 49.) She also admitted that she usually gave Bobby Colson wide leeway to prepare for the auction as he saw fit: she "hire[d] them to do the job, they do the job." (Docket No. 74, p. 50.)

Taken in the light most favorable to Plaintiff, these facts could support a conclusion that Mathes was vicariously liable for any tort that Colson might have committed in conducting the auction. Accordingly, Mathes's argument fails.

## 2.  Plaintiff's Prima Facie Case

Mathes also argues that she is not directly liable for negligence as administrator C.T.A. of the estate.  She maintains that she fulfilled her legal duty by "hiring a qualified auctioneer and, when the property was bid [on], asking the probate court for and obtaining approval of the contract of sale."  (Docket No. 44, p. 13.)  These facts, she continues, conclusively "establish that she acted as a reasonably diligent, prudent and cautious administrator would."  (Docket No. 44, p. 14.)

The Court disagrees.  Tennessee courts have set out a clear legal standard for Mathes's performance as administrator C.T.A.  She occupied a fiduciary position, <u>Mason v. Pearson</u>, 668 S.W.2d 656, 663 (Tenn. Ct. App. 1984), and was expected to deal with the estate and its beneficiaries in the utmost good faith.  <u>Baker v. Baker</u>, 142 S.W.2d 737, 750 (Tenn. 1940).  Like all fiduciaries, she was required to exercise the same degree of diligence and caution that reasonably prudent business persons would employ in the management of their own affairs.  <u>In re Estate of Cuneo</u>, 475 S.W.2d 672, 676 (Tenn. 1971).

A jury could find that Mathes's conduct as administrator fell short of this standard.  Mathes claimed in her deposition that she first learned about the home's true size when Bobby Colson made his announcement at the auction on October 18, 2014.  (Docket No. 74, p. 52.)  But the record shows that Norris & Norris sent Mathes a copy of the home's appraisal in December 2011, nearly three years before the auction took place.  (Docket No. 73-1, pp. 4–26.)  That appraisal, as Plaintiff notes, indicates that the home includes 3,553 square feet of above-grade living area.  (Docket No. 73-1, p. 9.)  From these facts, a jury might reasonably find that Mathes failed to perform basic background research on the home—including reading her own files— before the auction.  The jury could also decide that Mathes did not meet her duty when she failed

to oversee Bobby Colson's work before the auction. Either conclusion would support a finding that Mathes was negligent in serving as the estate's administrator. See McFarlin v. McFarlin, 785 S.W.2d 367, 371–72 (Tenn. 1989) (finding that an administrator was negligent through "inattentiveness" to estate's tax obligations and through overreliance on an accountant).

A jury might come to the same conclusion with respect to the sale itself. Mathes never attempted to stop the auction after she learned that the home's size was incorrectly advertised. (See Docket No. 74, pp. 52–53.) And she admits that, after the home was sold, she gave little thought to the advertising mistake at all, claiming that she "didn't think [the mistake] made a difference" in the sale, since "square footage means nothing." (Docket No. 74, pp. 54–55, 61.) And after the sale was finalized, she filed motions to approve a $315,000 sale price, despite having professional appraisals showing that the home was worth $165,000 more than that. (See Docket No. 73-1, p. 9.)

Any of these choices might strike a juror as lazy, incompetent, or excessively hasty. And each choice could support a finding that Mathes "did not act with the same diligence that reasonably prudent [people] would have used in the conduct of their own affairs." McFarlin, 785 S.W.2d at 372. Mathes's Motion is denied as to Count I.

**B. Count II: Negligence as Legal Counsel (Mathes)**

Mathes argues that Plaintiff's negligence claims require expert testimony because "an attorney's conduct regarding the administration of a probate estate is not within the common knowledge of laymen." (Docket No. 44, p. 8.)

The Court agrees. Tennessee courts generally assume that the average layperson is ill equipped to decide whether an attorney's conduct meets the applicable standard of care. Cleckner v. Dale, 719 S.W.2d 535, 540 (Tenn. Ct. App. 1986), abrogated on other grounds,

Chapman v. Bearfield, 207 S.W.3d 736 (Tenn. 2006) ("Whether a lawyer's conduct meets the applicable professional standard is generally believed to be beyond the common knowledge of laypersons."). Those courts have usually held that "cases of legal malpractice cannot be decided without expert proof regarding the applicable standard of care and whether the lawyer's conduct complies with this standard." Id. See also, e.g., Strong v. Baker, 2008 WL 859086, at *7 (Tenn. Ct. App. Mar. 31, 2008) ("It is well-settled law that, in a legal malpractice action, expert testimony is required to establish negligence and proximate cause.") (internal quotation marks omitted).

This rule has exceptions. An expert's testimony is not needed "in cases involving clear and palpable negligence." Strong, 2008 WL 859086, at *7 (quoting Rose v. Welch, 115 S.W.3d 478, 484 (Tenn. Ct. App. 2003)). In such cases, the average juror can recognize an attorney's failure to abide by professional standards of care because the attorney's mistakes are glaring and obvious. For instance, in Sweat v. Abernathy, 1993 WL 273892, at *4 (Tenn. Ct. App. July 22, 1993), the Tennessee Court of Appeals held that no expert testimony was needed when a lawyer "fail[ed] to show up for the trial he [was] retained to handle." And in Gray v. Boyle Investment Company, 803 S.W.2d 678 (Tenn. Ct. App. 1990), the court held that expert testimony was unnecessary when an attorney failed to advise real-estate purchasers of an impending foreclosure on a piece of property that they had bought.

The alleged negligence in this case is not quite so extreme. Plaintiff merely argues that Mathes breached her professional standard of care by failing to ensure that Colson's advertisements included correct information about the home: she alleges that Mathes "falsely advertised the square footage of the property [and] knew that the property had been falsely advertised, yet allowed the auction sale to continue." (Docket No. 66, p. 9.) Even if true,

Mathes's conduct would fall short of the alleged malpractice in <u>Sweat</u> or <u>Gray</u>, in which attorneys either abandoned clients at crucial stages of their representation or knowingly misrepresented a risk to their clients.  See <u>Sweat</u>, 1993 WL 273892, at *4; <u>Gray</u>, 803 S.W.2d at 678.  As those two cases illustrate, there is only a "narrow exception" to the general rule that requires expert testimony for legal malpractice claims.  <u>Nelson v. Michael D. Ponce & Assocs.</u>, 2015 WL 867117, at *6 (Tenn. Ct. App. 2015).  And a single unwise decision during the course of an attorney's representation is usually not enough to excuse a plaintiff from presenting expert testimony on the applicable standard of care for attorneys.  <u>See, e.g.</u>, <u>Spurlock v. Halprin</u>, 2006 WL 2346003, at 9 (M.D. Tenn. Aug. 11, 2006); <u>Nelson</u>, 2015 WL 867117, at *6 (finding no "clear and palpable" negligence in an attorney's failure to respond to a motion for summary judgment); <u>Strong</u>, 2008 WL 859086, at *7 ("[A]bsent evidence of obvious negligence, expert evidence is required.").

Though Mathes's conduct, if true, might strike the average layperson as less than diligent, it hardly rises to the level of such an "extreme case[]" of negligence as to dispense with the need for expert testimony altogether.  <u>Strong</u>, 2008 WL 859086, at *7.  The Court will grant Mathes's Motion on Count II.

### C.  Count III: Negligence and Negligence Per Se (Colson)

#### 1.  Negligence

Colson argues that Plaintiff's failure to submit expert testimony keeps her from showing that Colson violated the standard of care for auctioneers in Tennessee, since "the standard of care for a licensed auctioneer in this case must be established with the aid of expert testimony." (Docket No. 59, p. 15.)  In support of this argument, Colson maintains that auctioneering—like law, medicine, architecture, or other technical professions—"requires skills, experience, and

knowledge [that] the average juror does not have." (Docket No. 59, p. 19.) In light of this expertise, Colson concludes, "expert testimony is required" for Plaintiff's negligence claim. (Docket No. 59, p. 19.)

The Court disagrees. The mere availability of expert proof does not mean that a court must use it. Miller v. Willbanks, 8 S.W.3d 607, at 615 (Tenn. 1999). Instead, "expert testimony is necessary only when the subject of examination requires knowledge or experience that person lacking special skills do not have and that cannot be obtained from ordinary witnesses." Id. See also, e.g., Lawrence Cty. Bank v. Riddle, 621 S.W.2d 735, 737 (Tenn. 1981). If the jury can understand a subject without expert testimony, then "an expert witness is not necessary." Id.

A few skilled professions almost always require expert testimony to establish professional standards of care. Tennessee courts usually hold that a "lawyer's standard of care, except in the most extreme cases, should be proved using expert testimony." Cleckner, 719 S.W.2d at 540. The same is true for physicians, see Williams v. Baptist Memorial Hospital, 193 S.W.3d 545, 553, and architects, Martin v. Sizemore, 78 S.W.3d 249, 268–69 (Tenn. 2001). Courts have held that, in some circumstances, other professions require expert testimony. See, e.g., Walker v. Arrow Exterminators, Inc., 1999 WL 722639 (Tenn. Ct. App. Sept. 17, 1999) (requiring expert testimony for standard of care concerning pest-control specialists). But courts do not routinely call for expert testimony in negligence claims against auctioneers. In fact, Tennessee courts have come to the exact opposite conclusion. In Lindsey v. Coulter, 1998 WL 823125, at *6 (Tenn. Ct. App. 1998), the Tennessee Court of Appeals considered a summary-judgment motion involving an auctioneer's alleged negligence. Though neither party had submitted expert testimony, the court found that "a jury could reasonably conclude that [the auctioneer] was negligent" in promoting the auction sale. Id. at *6.

The same is true here. Colson has not shown any reason for the Court to assume that a jury would need an expert to understand the claim against Colson. Plaintiff is not required to produce expert testimony on the standard of care for auctioneers, so she is not precluded from making out a prima facie negligence claim against Colson.[6]

### 2. Negligence Per Se

The doctrine of negligence per se is firmly established in Tennessee law. Cook, 878 S.W.2d at 937. A plaintiff may bring a negligence per se claim by showing that a defendant has violated a statue or regulation that prescribes the standard of conduct for a reasonable person in specific circumstances. Id.; Smith, 841 S.W.2d at 831.

Here, Plaintiff argues that Colson has violated the standard of care for auction advertisements, which is set out in Rule 160-01.20(2) of the Tennessee Auctioneer Commission. The Rule provides that

> "false, deceptive, misleading and untruthful advertising is expressly prohibited. Any advertisement or advertising shall be deemed to be false, deceptive, misleading or untruthful, if it: . . . (a) contains a misrepresentation of fact."
> Tenn. Comp. R. & Regs. 160-01.20(2).

Colson argues that Plaintiff's negligence per se claim should be dismissed because "the rules and regulations of the Tennessee Auctioneer Commission do not establish a private right of action against auctioneers" and were never "intended for the purpose of establishing a standard for civil liability in a court of law." (Docket No. 59, p. 12.)

---

[6] Colson also argues that "Plaintiff cannot establish that Colson violated the acceptable standard of care for licensed auctioneers in Tennessee." (Docket No. 59, p. 10.) Specifically, he contends that "an auctioneer has no duty to measure a home" before an auction, so Colson was not negligent in failing to learn the home's true size. (Docket No. 59, p. 10.) But Colson cites no legal authority to support his contention that this is, in fact, the duty of care for auctioneers. Instead, he relies on a single affidavit from William "Bear" Stephenson, an auctioneer and real estate professional. This is not enough to warrant summary judgment. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) ("[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion.").

However, negligence per se does not apply only to regulations that "establish a private right of action," as Colson suggests. (Docket No. 59, p. 12.) See United Inventory Servs., Inc. v. Tupperware Brands Corp., 2010 WL 1009978, at *4 (E.D. Tenn. Mar. 15, 2010) ("[Under Tennessee state law, t]here are instances where a statutory violation may give rise to a negligence per se claim even where no private right of action exists."). Rather, a plaintiff may bring a negligence per se claim when he shows that a defendant violated a statute, ordinance, or regulation that imposes a duty for the benefit of the public. See Cook, 878 S.W.2d at 937 ("The standard of conduct expected of a reasonable person may be prescribed in a statute and, consequently, a violation of the statute may be deemed to be negligence per se.").

Colson's second argument is also unavailing. Colson also argues that, because Bobby Colson corrected the inaccurate advertisements in an announcement at the auction, Colson complied with Rule 160-01.20. In support of this argument, Colson points to several cases in which a court has noted that "announcements made on the date of auction take precedence over prior advertising." (Docket No. 69, p. 14.) But none of those cases construe the Rules of the Auctioneering Commission. Moreover, each cited case concerns an auctioneer's power to accept or reject bids, not the auctioneer's duty to provide correct information on advertisements. It would be improper to find that Plaintiff's negligence per se claim is foreclosed based on cases that bear little relevance to this dispute.

In short, Colson has not shown why it is entitled to judgment as a matter of law on Plaintiff's negligence per se claims. Accordingly, it may not prevail on summary judgment. FED. R. CIV. P. 56(c); See, e.g., Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) ("[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion.").

### 3. Damages

Finally, Colson argues that Plaintiff cannot prove damages on either of her Count III claims because she has failed to show that the home was worth more than $315,000 at the time of the auction. Colson devotes most of this section to an expert report prepared by Russell Parrish and Curtis Hopper, two real estate appraisers. That report, Colson argues, shows that court-ordered auction sales usually fetch far lower prices than open-market sales.

But how does this show that Colson is entitled to summary judgment? After all, Plaintiff submitted a professional appraisal estimating the home's value at $480,000, and Plaintiff's claim for damages is largely based on that appraisal. (See Docket No. 30, pp. 3, 7, 9, 10; Docket Nos. 66, 67, 73-1.) Colson tries to imply that it is entitled to summary judgment because it offers the opinions of expert witnesses, but a party is not entitled to summary judgment merely because it offers expert testimony. See United States v. Calderon, 2007 WL 2913874, at *2 (6th Cir. Oct. 3, 2007) ("Expert testimony, even if uncontradicted, may be believed in its entirety, in part, or not at all."); Dawahare v. Spencer, 210 F.3d 671 (6th Cir. 2000). And if Colson is suggesting that its experts' report is simply more persuasive than Plaintiff's evidence, Colson misunderstands the purpose of summary judgment. At the summary judgment stage, the Court's "function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a *genuine issue for trial*." Anderson, 477 U.S. at 249 (emphasis added).

In the end, this is not a complicated question. Colson's brief has pointed out that the parties disagree about the home's value in October 2014. In doing so, Colson has given the Court an excellent reason to deny the Motion. Cf. FED. R. CIV. P. 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.").

**CONCLUSION**

For the foregoing reasons, the Court DENIES Mathes's Motion on Count I, but GRANTS

her Motion on Count II.  The Court DENIES Colson's Motion on Count III.

_____

KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE