IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
AT NASHVILLE

JOAN ROSS WILDASIN,

    Plaintiff,

v.

PEGGY D. MATHES, et al.,

    Defendants.

Case No. 3:14-cv-02036

Judge Curtis L. Collier
Magistrate Judge Jeffery S. Frensley

# **M E M O R A N D U M**

Before the Court are Defendant Peggy Mathes's motion to reconsider the Court's ruling on her first motion for summary judgment (Doc. 111) and her second corrected motion for summary judgment (Doc. 151). For the reasons explained below, the Court will **DENY** these motions.

## I. BACKGROUND

This case concerns a dispute over the auction sale of a house in Pegram, Tennessee. Plaintiff Joan Ross Wildasin sued the administrator C.T.A., Peggy Mathes, for negligence as administrator C.T.A. (Count I) and negligence as legal counsel (Count II).

### A. The Property

Jane Kathryn Ross was the mother of Paul Sorace and Plaintiff. In 1998, Ross executed a will that left most of her estate to Sorace and Plaintiff in equal portions. In 2000, she assigned her power of attorney to Plaintiff. *In re Ross*, 2014 WL 2999576, at *1 (Tenn. Ct. App. June 30, 2014), *perm. app. denied* (Tenn. Nov. 21, 2014).

In 1991, Sorace had bought a small two-bedroom home on seven acres of land in Pegram, Tennessee, for $57,400. At some point in 2004, Sorace and Ross began discussing the idea of building a larger home on Sorace's land in Pegram so they could live together. They signed an informal agreement to build the home on July 6, 2005, and construction began shortly thereafter. *Id*. The home was finished about a year later. By the time they moved in, Ross had contributed the vast majority of the construction costs—about $433,000 to Sorace's $16,000. *Id*.

Ross soon began showing signs of advanced dementia. By July 2008, her health had deteriorated so dramatically that Plaintiff began to consider moving her into a secure assisted living center. Since Ross had few liquid assets, Plaintiff asked Sorace to sell the home in Pegram. Sorace refused. *Id*. Acting on Ross's behalf, Plaintiff sued Sorace for unjust enrichment. *Id*.

Ross died in 2010. Mathes was appointed Administrator C.T.A of her estate. Ross's suit against Sorace continued, with the estate substituted as the plaintiff. The case was eventually transferred to the Seventh Circuit Court for Davidson County (the "probate court").

On March 14, 2011, Norris & Norris PLC—which represented Mathes at the time—obtained a professional appraisal of the home in Pegram. (*See* Doc. 73-1, p. 26.) The appraisal indicated the home had 3,553 square feet of finished, above-grade interior space. (Doc. 30-1, pp. 5–8.) The appraisal also placed the home's estimated value at $480,000. (Doc. 73-1, p. 5.) Norris & Norris emailed a copy of the appraisal to Mathes on December 14, 2011. (Doc. 73-1, p. 4.)

The probate court ultimately found for Ross's estate and entered a $417,000 judgment against Sorace. *In re Ross*, 2014 WL 2999576, at *2. When Sorace failed to pay the judgment, the estate bought the Pegram land at a sheriff's auction for $325,000. (Doc. 73, ex. 2.)

### B. Auctioning the Property

After Ross's estate bought title to the land, Plaintiff moved to sell the land at an auction. (Doc. 52-1.) The probate court granted the motion and directed Mathes to enter a listing agreement before the sale. (Doc. 43-2, p. 1.) Mathes hired Bill Colson Auction and Realty Company to sell the property at auction. Their agreement set out the terms of the sale: the land would be sold within ninety days and the purchase price would be made in cash, with 15% earnest money due on the day of the sale and the remainder due on closing. (Doc. 74-5.) Robert L. "Bobby" Colson was the auctioneer primarily responsible for handling the sale. (Doc. 70, p. 4.)

The sale was nothing new for Colson. He has been a licensed auctioneer and real estate broker for thirty-five years and has been certified by the Certified Auctioneers Institute since 1987. He also belongs to the Tennessee Auctioneer Commission, which helps set standards for auctioneers' conduct throughout the state. (Doc. 53, pp. 1–2.) As he put it in his deposition, he was more than familiar with the "accepted standard of care . . . for auctioneers in Tennessee." (Doc. 53, p. 2.)

Once Colson knew the address of the property, he began researching the land itself. He turned to an online subscription service called RealTracs.net, which retrieves basic data about land parcels, usually culled and aggregated from public records. (Doc. 70, p. 5.) He testified that he uses this service for "[e]very sale" to learn the dimensions of the properties he sells at auction. (Doc. 77, p. 57.) On September 8, 2014, Colson retrieved a property report for the home, stating the home's total size was "2,538 Sq[uare] Feet." (Doc. 74, ex. 9, p. 1.)

The home was actually much larger than that. On a property-tax card, the Davidson County Tax Assessor's Office lists the home as having 3,573 square feet of centrally-cooled,

3

centrally-heated space, with 2,538 square feet of "Finished Area." (Doc. 75-5.) And the County Clerk's Deed (Doc. 20)—which Plaintiff's attorneys had sent to Mathes in 2012—states the home "consist[s] of approximately 3,553 square feet of living area above grade, and approximately 2,599 square feet of living area below grade." (Doc. 74-20, p. 2.)

In his deposition, Colson testified he did not directly consult any public records to determine the size of the home. (Doc. 77, pp. 50–51, 54–55, 56.) He also admitted he did not understand how the square footage listed on the RealTracs report was calculated, or, at the very least, he "hadn't thought about it." (Doc. 77, p. 56.) Still, he relied on the RealTracs report in preparing for the auction. And he relied on this figure to advertise for the auction, posting several ads for a "2,500 Sq. Ft. Brick Home" in local newspapers and online. (Doc. 53-4; Doc. 70, p. 8.)

For her part, Mathes admits she never saw the advertisements before they were printed; when asked what she typically does to ensure advertisements contain accurate information about real estate, she concedes she "do[es]n't do anything." (Doc. 74, p. 50.) Mathes also never sent Colson a copy of the 2011 appraisal, nor did Colson ever request it. (Doc. 77, p. 36.)

### C. The Auction Sale

The auction sale was scheduled for 10:30 a.m. on October 18, 2014. (Doc. 70, p. 7.) About an hour before the auction began, Colson opened the home to the public. (Doc. 70, p. 9.) As potential buyers milled around inside the home, Eugene Bulso, Jr.— Plaintiff's attorney in this action—approached Colson and introduced himself. (Doc. 70, p. 9.) Bulso then opened a laptop computer that displayed a copy of the March 2011 appraisal report, pointing out that the report listed the home's size as 3,553 square feet—not, as auction flyers had advertised, 2,500 square feet. (Doc. 70, p. 9–10.)

The auction had not yet begun. Colson, apparently thinking there was still time to correct the error, found Mathes and told her that "[a] dude just showed [him] an appraisal that the square footage was 3,500." (Doc. 77, p. 36.) He then made an announcement to the assembled bidders:

> I had—yeah. I had advertised 2,500 square feet, which I took off the tax record, but the tax record did not include the upstairs. So there's about another 11 or 12 hundred square feet that—that are up—that—that's upstairs there that we took off an appraisal that one of the attorneys had here if anybody'd like to look at it. But there's another about 1200—so you're looking at probably 3500 square feet there, more or less.

(Doc. 77, p. 46.)

Nobody cancelled the auction after the announcement. (Doc. 70. p. 12.) Colson later said that this was not unusual: on "more than one occasion," he had learned new information about a piece of property on the day it was being auctioned, sometimes from neighbors or from other auction attendees. (Doc. 53, p. 5.) He also felt good about the chances of selling Plaintiff's home. He noticed there was "a good-sized crowd" gathered at the home that morning, including two people who had bought land at other auctions Colson had worked. (Doc. 53, p. 6.)

The auction began about five minutes after the announcement. (Doc. 70, p. 14.) After taking bids for about fifteen minutes, Colson mentioned the home had been appraised for $480,000 a few years earlier. (Doc. 70, p. 14.) He also told the crowd that property taxes had assessed the home's value at over $400,000. (Doc. 70, p. 14.) The bidding continued for a few more minutes. Then, after about half an hour of bidding, Colson dropped the gavel for the highest bidder. The final sale price was $315,000. (Doc. 70, pp. 14–15.)

### D. Approving the Sale Price

Mathes filed a motion to approve the auction contract the next week. (Doc. 52-5, p. 1–3.) On November 7, 2014, the parties appeared at a hearing before Judge David R. Kennedy. Both sides told Judge Kennedy there was no dispute on the basic question of approving the contract.

5

Mathes stated Bulso had agreed not to "object to the contract being approved." (Doc. 73-7, p. 3.) Bulso also told Judge Kennedy approving the contract was "the better course," since neither side wanted the "property itself to be embroiled in litigation." (Doc. 73-7, p. 4.) The bankruptcy trustee said the same thing: the sale was conducted legally, so there was no reason to prevent the high bidder from buying the home. (Doc. 73-7, p. 6.)

But the trustee also pointed out that Plaintiff, on behalf of Ross's Estate, had bought the home only a few months earlier for $325,000, which was "very close" to the $315,000 sale price. (Dock. 73-7, p. 6.) The trustee then asked Judge Kennedy to acknowledge that $315,000 was the fair market value of the home. (Doc. 73-7, p. 7–8.) He pointed out that Bulso had filed a motion in that earlier sale; in that motion, Bulso had argued $325,000 "is conclusively presumed to be the value of the property." (Doc. 73-7, p. 7.)

Judge Kennedy refused to confirm that $315,000 was the home's fair market value. (Doc. 73-7, p. 15.) Still, he approved the sale, noting the contract set a "fair and reasonable price based upon all of the circumstances" and $315,000 was a "commercially reasonable price." (Doc. 73-7, p. 20.)

### E. Subsequent Procedural History

Plaintiff filed a negligence suit against Mathes and Bill Colson Auction & Realty in this Court. Judge Sharp denied Mathes's first motion for summary judgment. (Doc. 90.) Mathes then filed a motion for reconsideration (Doc. 111), and, with the Court's permission, filed a second corrected motion for summary judgment (Doc. 151). Plaintiff responded in opposition to Mathes's second corrected motion for summary judgment (Doc. 154) and Mathes replied (Doc. 161). This case was then reassigned to the undersigned. (Doc. 174.)

## II. STANDARD OF REVIEW

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Leary v. Daeschner*, 349 F.3d 888, 897 (6th Cir. 2003). The Court should view the evidence, including all reasonable inferences, in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis Inc.*, 253 F.3d 900, 907 (6th Cir. 2001).

## III. ANALYSIS

Before the Court are Mathes's motion to reconsider the Court's ruling on her first motion for summary judgment and Mathes's second corrected motion for summary judgment. The Court will address each in turn.

### A. Mathes's Motion to Reconsider

Mathes raises two arguments in her motion to reconsider. First, Mathes argues the fair market value of the home should not be used to calculate damages in the context of an auction, or alternatively that the auction sale price is the fair market value of the home. In either case, Mathes argues the home sold for its proper value, and thus Plaintiff is collaterally estopped from relitigating the issue of the home's value because Judge Kennedy approved the sale and found the auction price was commercially reasonable. Second, Mathes argues Bill Colson Auction and Realty Company was not an agent of hers, and therefore that entity's acts are not attributable to her.

Collateral estoppel prevents relitigation of factual matters that were fully considered and decided in an earlier proceeding. *Edwards v. Aetna Life Ins. Co.*, 690 F.2d 595, 598 (6th Cir.

7

1982).  Under Tennessee law, collateral estoppel "bars the same parties or their privies from relitigating in a later proceeding legal or factual issues that were actually raised and necessarily determined in an earlier proceeding." *Mullins v. State*, 294 S.W.3d 529, 534 (Tenn. 2009).

Mathes's first argument, regarding the fair market value of the home and collateral estoppel, does not warrant a reversal of Judge Sharp's decision.  Although Judge Sharp used the phrase "fair market value" in his opinion (Doc. 89 ("Plaintiff's injuries would therefore equal the difference between the home's fair market value and $315,000")), argument over that term's meaning in the context of an auction does little to advance Mathes's collateral estoppel argument.  Instead, the question is whether a court has determined that the value Plaintiff received for her home would not have been higher had the home been advertised properly.

Mathes first argues Plaintiff is not entitled to receive the fair market value of a home sold at auction because the market conditions at play in an auction are inherently different than those present in a traditional market transaction.  *See BFP v. Resolution Trust Corp.*, 511 U.S. 531, 537–38 (1994).  Thus, Mathes argues, Plaintiff is only entitled to the fair auction value of the home, which is what Plaintiff received, as Judge Kennedy decided the auction was commercially reasonable.

Mathes alternatively argues the auction sale price of a home is the fair market value of the home.  Mathes cites *In re Excello Press, Inc.* for the proposition that "[t]he product of a commercially reasonable sale *is* the fair market value," and argues that because Judge Kennedy found the sale was commercially reasonable, the fair market price of the home is the amount it sold for at auction.  890 F.2d 896, 904–05 (7th Cir. 1989) (emphasis in original).

The Court sees no practical difference between these arguments, and does not disagree with their legal premises.  These arguments, however, assume the home was properly advertised,

8

which is clearly not the case here.  The market for a 2,500 square foot home and the market for a 3,500 square foot home are two different markets.  Parties interested in purchasing the home in question, a 3,500 square foot home, would likely not have attended an auction for a 2,500 square foot home, and parties interested in purchasing a 2,500 square foot home, who likely would have attended the auction, may have been discouraged by the last minute revelation that the home was in fact 35,000 square feet.  The result of the auction in this case thus has little bearing on either the fair market value of the home or the value the home would have sold for at auction if properly advertised.

Despite Judge Kennedy's ruling that $315,000 was a commercially reasonable price, Judge Kennedy never decided $315,000 is the price the house would have sold for had it been properly advertised.  No court has determined the house would not have sold for more had it been properly advertised, and thus collateral estoppel does not apply.

With regard to Mathes's second line of argument, that Bill Colson Auction and Realty was not her agent, the Court also sees no reason to disturb Judge Sharp's decision.  Mathes relies on *Investor Syndicate of America, Inc. v. Allen* to argue Colson was an independent contractor with regard to its physical activities and that advertising a home is a physical activity as envisioned by the Tennessee Supreme Court in *Investor Syndicate*.  279 S.W.2d 497, 501 (Tenn. 1955).[1]

While it is debatable whether advertising a home constitutes a physical activity within the meaning of the passage the Tennessee Supreme Court quoted from the First Restatement of

---

[1] "An agent may be one who, to distinguish him from a servant in determining the liability of the principal, is called an independent contractor.  Thus, the attorney at law, the broker, the factor, the auctioneer, and other similar persons employed either for a single transaction or for a series of transactions are agents, although as to their physical activities, they are independent contractors." 279 S.W.2d 497, 501 (Tenn. 1955) (quoting Restatement (First) of Agency § 1 (1933)).

Agency, the Court need not address that particular nuance, as *Investor Syndicate* is inapposite. First, *Investor Syndicate* did not address whether an auctioneer is an agent or an independent contractor, as the case concerned a tax dispute regarding investment contracts, and the court merely quoted a passage from the First Restatement of Agency that happened to identify auctioneers as an example. Second, the weight of authority addressing whether an auctioneer is an agent, as identified by Judge Sharp, is clear that an auctioneer is, in fact, an agent. *See Green v. Crye*, 11 S.W.2d 869, 870 (Tenn. 1928) ("A person employed as the auctioneer at the sale of property, real or personal, is the primary agent of the owner."); *Lindsey v. Coulter*, 1998 WL 823125, at *3 (Tenn. Ct. App. Nov. 24, 1998); *Johnson v. Haynes*, 532 S.W.2d 561, 564–65 (Tenn. Ct. App. 1975).

For these reasons, Mathes's motion to reconsider will be denied.

**B.     Mathes's Second Corrected Motion for Summary Judgment**

Mathes presents one argument for summary judgment: that she is immune from suit as an employee of Metropolitan Nashville and Davidson County pursuant to the Governmental Tort Liability Act, Tenn. Code Ann. § 29-20-101 *et seq*.

In response, Plaintiff presents three arguments: first, that public administrators such as Mathes are exempt from the Governmental Tort Liability Act via Tenn. Code Ann. § 30-1-402; second, that Mathes is not an employee of Metropolitan Nashville and Davidson County, and thus is not shielded by the Governmental Tort Liability Act; and third, that protection under the Governmental Tort Liability Act is waived to the extent a governmental entity possesses liability insurance, Tenn. Code Ann. § 29-20-403, and Mathes is covered by liability insurance.

The Court need only address Plaintiff's first responsive argument, as it is dispositive of the issue. Section 30-1-402 prescribes that public administrators shall, "in all things," be governed by the same "laws, rules, duties, and penalties" applicable to other administrators.

> "[Public] Administrators, guardians, and trustees, shall, in all things, be governed by, and subject to, all the laws, rules, duties, and penalties, prescribed by law for the governance of other administrators and guardians, and the management and settlement of estates and trusts."

Thus, even assuming Mathes is an employee of Metropolitan Nashville and Davidson County and her alleged liability insurance does not remove her from the scope of the Governmental Tort Liability Act, she is still subject to this lawsuit via operation of § 30-1-402.

Mathes correctly points out that "legislation authorizing suits against the state must provide for the state's consent in plain, clear, and unmistakable terms." *Mullins v. State*, 320 S.W.3d 273, 283 (Tenn. 2010). But the Court finds the language of § 30-1-402 is sufficiently clear and explicit. The statute states that "in all things" public administrators shall be "subject to . . . the laws, rules, duties, and penalties" prescribed for other administrators and guardians. Other administrators and guardians are subject to the type of lawsuit at hand, and lawsuits obviously fall within the meaning of "all things." Mathes is thus not shielded from this lawsuit by the Governmental Tort Liability Act.

For this reason, Mathes's motion for summary judgment will be denied.

## IV. CONCLUSION

For the foregoing reasons, the Court will **DENY** Defendant Peggy Mathes's motion to reconsider (Doc. 111) and second corrected motion for summary judgment (Doc. 151).

**An appropriate order shall enter.**

/s/_____
**CURTIS L. COLLIER**
**UNITED STATES DISTRICT JUDGE**